**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**CIVIL ACTION NO. 1:17–cv–1154-NCT-JLW**

P&L DEVELOPMENT, LLC,

     **Plaintiff,**

v.

BIONPHARMA INC. and
BIONPHARMA HEALTHCARE LLC,

     **Defendants.**

**BRIEF IN SUPPORT OF MOTION TO DISQUALIFY CHARLES
CAIN AND KILPATRICK TOWNSEND & STOCKTON LLP FROM
REPRESENTING PLAINTIFF P&L DEVELOPMENT, LLC IN
THIS ACTION AND FOR DISMISSAL WITHOUT PREJUDICE**

Defendants Bionpharma Inc. and Bionpharma Healthcare LLC (collectively, "Bion" or "Defendants"), pursuant to Local Rules 7.3 and 83.10e(b), as well as North Carolina Rules of Professional Conduct 1.9 and 1.10, hereby submit this Brief in Support of Motion to Disqualify Charles Cain and Kilpatrick Townsend & Stockton LLP ("Kilpatrick LLP") from Representing P&L Development, LLC ("PLD") in this Action and for Dismissal Without Prejudice.

**I.**     **NATURE OF THE MATTER BEFORE THE COURT**

Between 2003 and 2012, PLD's and Bion's predecessors negotiated and signed the four agreements at issue in this action (including amendments thereto, the "Agreements"). These Agreements remain in effect today, govern the parties' contractual

1

relationship, and are the basis of this very lawsuit. When the Agreements were drafted and negotiated, Charles Cain served as the General Counsel of Bion's predecessor, Banner Pharmacaps. In his role as General Counsel, which he held for over twelve years (from August 2000 to March 2013), Mr. Cain was responsible for Banner's overall legal affairs, including commercial contracts and strategic negotiation. Mr. Cain's responsibilities encompassed these Agreements as well, as his signature or approval appears on many of the Agreements or amendments thereto, and his name appears on contemporaneous correspondence regarding them. In November 2015, Bion purchased Banner's generic pharmaceutical product business (a portion of that business is at issue in this litigation), including each of the Agreements. Less than one year later, in September 2016, PLD hired Mr. Cain as its General Counsel. In sum, the chief legal officer who apparently advised *Defendants'* predecessor in connection with the very Agreements at issue now serves as the chief legal officer for *Plaintiff*.

On December 28, 2017, PLD filed its complaint in this action and had it verified by Mr. Cain (the "Cain-Verified Complaint"). In the Cain-Verified Complaint, Mr. Cain attests that Bion breached its duties under each of the Agreements, which he construes to be "requirements contracts." In support of PLD's motion for a preliminary injunction, Mr. Cain submitted a declaration purporting again to construe the nature and extent of Bion's obligations under the Agreements. Needless to say, Bion disputes Mr. Cain's attestations that Bion has breached the Agreements, and rejects Mr. Cain's characterization of them as "requirements contracts." But beyond that, in accordance with

2

his duties under the Rules of Professional Conduct, Mr. Cain cannot be permitted to advise PLD—the Plaintiff—(a) adverse to Bion and (b) in a litigation that is substantially related to Mr. Cain's prior work for a business Bion now owns.

Bion does not bring this motion lightly, but believes that Mr. Cain's involvement in this case jeopardizes the confidential information shared with Mr. Cain by Bion's predecessor, and risks the very harm that Rule 1.9(a) was meant to address. Thus, while Bion is preparing to respond to PLD's motion for a preliminary injunction on January 12, 2018, Bion is raising these issues with expediency.

Attorneys owe their present and former clients the duties of loyalty and confidentiality. Under North Carolina Rule of Professional Conduct 1.9(a), "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." Mr. Cain must be disqualified from representing PLD under Rule 1.9(a). First, under settled law, Bion holds the status of a former client, as it purchased years ago Banner's generic pharmaceutical product business. Second, Mr. Cain's prior work was "substantially related" to this litigation— while Banner's General Counsel, it is apparent that Mr. Cain bore responsibility relating to the four Agreements at the heart of this case. Third, there is material adversity because PLD and Bion are now opposing parties in this litigation. Because Mr. Cain has been in communication with Kilpatrick LLP concerning the details of this lawsuit and the

3

wording of the Cain-Verified Complaint itself, the disqualification also should extend to Kilpatrick LLP.

Accordingly, Bion respectfully requests that the Court (a) disqualify Mr. Cain and Kilpatrick LLP from representing PLD in connection with the claims in this lawsuit and (b) dismiss this lawsuit without prejudice, so that PLD may retain new counsel if it elects to re-file.

## II.    STATEMENT OF RELEVANT FACTS

Between 2003 and 2012, Plaintiff's and Defendants' predecessors—respectively, P&L Developments of New York Corporation ("PLD-NY") and Banner Pharmacaps Inc. ("Banner")—entered into the Agreements. ECF Nos. 12, 12-1, 12-2, 12-3 (Agreements, as amended). The Agreements each relate to the sale of generic pharmaceutical product (specifically, Ibuprofen, Naproxen, Cetirizine, and Loperamide). *Id.* The alleged breach of the Agreements is the central issue in this lawsuit. *See* ECF No. 7 (Cain-Verified Complaint).

From August 2000 until March 2013, Charles Cain—who is now PLD's General Counsel—represented Defendants' predecessor, Banner, as Banner's General Counsel. Ex. 1 (Cain LinkedIn Page). Throughout his twelve year tenure as Banner's General Counsel, Mr. Cain states that he was "[r]esponsible for overall legal affairs" at Banner and oversaw Banner's "[s]trategic negotiations." *Id.* Mr. Cain was also "[r]esponsible for . . . [Banner's] commercial contracts." *Id.* It appears that Mr. Cain also bore responsibility for the Agreements at issue in this case. With respect to the Ibuprofen Agreement (one of

4

the four at issue), for example, Mr. Cain was thanked in contemporaneous correspondence for "all of [his] help in finalizing this matter." Ex. 2 (Letter from Gruber to Cain (5/12/2003)). Mr. Cain personally signed the second amendment to the Agreement on behalf of Banner, and made and approved edits therein. ECF No. 12 at Second Amend., page 3 & App'x A (Ibuprofen Agreement). Mr. Cain also "APPROVED" the first and third amendments to the Agreement on behalf of Banner "Legal." *Id.* at First Amend., page 2 & Third Amend., page 4. Mr. Cain was similarly involved with the other Agreements. With respect to the Loperamide Agreement, Mr. Cain circulated the final copy of Agreement, and the Naproxen and Cetirizine Agreements both bear Mr. Cain's "APPROVED" stamp on behalf of Banner's legal department. Ex. 3 (Transmittal Letter from Cain to Gruber (1/3/2005)); ECF No. 12-1 at 25 (Naproxen Agreement); ECF No. 12-2 at 25 & First Amend., page 2 (Cetirizine Agreement).

On November 7, 2015, Banner exited the generic pharmaceutical product business—the sole business with any relevance in this action—by selling the business to Bion for ███████████ and agreeing to a non-compete. Ex. 4 ¶¶ 2.4(a), 6.14(a) (Bion-Banner Purchase Agreement).[1] Specifically, in addition to a non-compete, Banner transferred to Bion: (a) ██ third party agreements, including the four Agreements at issue

---

[1] Bion's purchase agreement was technically with Banner Life Sciences LLC, not Banner Pharmacaps Inc. The distinction is immaterial for the purposes of this motion, as Banner Life Sciences LLC was simply Banner Pharmacaps Inc.'s successor. *See* Ex. 7 (describing the transfer of assets and agreements from Banner Pharmacaps Inc. to Banner Life Sciences LLC) (Letter from Banner to PLD (12/5/2014)).

here, as well as vendor and other consulting agreements necessary to transition and continue the business; (b) ▮ regulatory approvals, including pipeline products and data related thereto, as well as related files; (c) outstanding purchase orders, as well as related liabilities and certain pending accounts receivable (the rights to which arose with respect to post-closing sales); (d) existing inventory; and (e) issued and pending patents. *Id.* ¶ 2.1(a); Ex. 5 (Schedules to Purchase Agreement) at Schedule I. Banner also transferred ownership over "all records . . . related to the Transferred Assets or Assumed Liabilities, including purchase and sales records, customer lists and records, customer prospect lists and records, research and development files, cost and pricing information, supplier lists and records, and accounting and financial records. . . ." Ex. 4. ¶ 2.1(a)(x).

The parties further agreed that the assets being transferred, "coupled with the rights afforded" under the relevant agreements, "are adequate and sufficient to conduct the Business as conducted since January 1, 2015 and as currently conducted." *Id.* ¶ 4.22; *see also id.* at 1 (defining "Business" as "a generic pharmaceutical product business involving the development, manufacture, marketing, distribution and sale, either directly or indirectly through the third parties, of the Products set forth" in the agreement).

Additionally, ███████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ *See id.* ¶ 6.7(a). Banner further agreed to make its broader team available "in key areas"—including its legal team—during a transitional period to ensure a smooth transfer of the business. *See* Ex. 6

at Schedule A, page 4 (Transition Services Agreement). Both the parties and the industry understood that Bion had purchased Banner's generic pharmaceutical product business, rather than a mere assignment of contracts. Indeed, contemporaneously with the sale, PLD's President (Evan Singer) personally acknowledged that Banner had entered into an agreement with Bion "pursuant to which [Banner] will sell its generic pharmaceutical product business . . . to Bion," and that Bion and Banner were working to "achiev[e] a seamless transition of the Business" after the sale. ECF No. 7-1 at 1 (Letter to PLD re Banner Sale). To this day, as PLD has acknowledged, Bion continues to operate the business it acquired from Banner, including using the same supplier and selling to many of the same customers, including PLD. *See, e.g.,* ECF No. 34 at 4 ("PLD and Bion (or their predecessors) have done business together under these [ ] Agreements since 2003.") (PLD's Mot. for Prelim. Inj.); Ex. 10 at 1 (observing that Bion took over Banner's contract with Patheon following the acquisition) (Letter from Boyles to Berkelhammer (1/9/2018)).

In September 2016, less than one year after Banner sold its generic pharmaceutical product business to Bion, PLD hired Mr. Cain to serve as its General Counsel. ECF No. 22 ¶ 1 (Cain Decl.). Mr. Cain still serves in that role today, which means that he now represents PLD in connection with litigation over the same Agreements with which, as described above, he was previously involved while General Counsel of Bion's predecessor. Indeed, in the Cain-Verified Complaint, Mr. Cain declares that he is "acquainted with all of the facts and circumstances stated [in the complaint]" and that the

7

"contents of same, to my knowledge, are true except" where stated upon information and belief. ECF No. 7 at 28 (Cain-Verified Complaint). Among the "facts and circumstances" that Mr. Cain purports to be "acquainted with" are Bion's alleged breach of the Agreements, as well as PLD's allegations concerning how the Agreements should be construed. *Id.* ¶ 5 ("In particular, the contracts in this case require PLD to purchase all of its requirements of various drugs in softgel form from Bion.").

On December 31, 2017, following a December 28, 2017 telephone discussion that brought these issues to a head, Bion's counsel sent a letter to Kilpatrick LLP alerting them to authority barring attorneys from pursuing matters adverse to former clients. Ex. 8 at 1 (Letter from Berkelhammer to Taylor (12/31/2017)). Two days later, without responding to Bion's counsel's letter, PLD filed a declaration from Mr. Cain in support of its motion for injunctive relief. ECF No. 22 (Cain Decl.). Mr. Cain's declaration recites facts and events relevant to this case, and again purports to interpret Bion's obligations under the Agreements, including whether Bion has "an obligation to meet PLD's requirements for the products under the Agreements." *Id.* ¶ 8. Between January 3 and January 9, 2018, the parties engaged in further correspondence regarding these issues. Ex. 9 (E-mail from Taylor to Berkelhammer (1/3/2018)); Ex. 10 (Letter from Boyles to Berkelhammer (1/9/2018)); Ex. 11 (Letter from Berkelhammer to Boyles (1/9/2018)). Notwithstanding this correspondence, PLD has not agreed to take any action to ensure that Mr. Cain would not advise PLD in this action adverse to Bion. *See id.*

8

### III. QUESTIONS PRESENTED

1. Plaintiff's current General Counsel, who is currently advising Plaintiff in this litigation, was formerly the General Counsel of Defendants' predecessor. As the result of an acquisition, Defendants now own the relevant business of their predecessor. It is apparent that, while General Counsel of Defendants' predecessor, Plaintiff's current General Counsel—Charles Cain—advised Defendants' predecessor concerning the very Agreements at issue in this case. Must Mr. Cain be disqualified from representing Plaintiff in this case on account of the duties he owes to Defendants?

2. Mr. Cain and Plaintiff's outside counsel, Kilpatrick LLP, have been in communication regarding this litigation, including regarding the complaint that Plaintiff filed and Plaintiff's pending motion for a preliminary injunction. Must Kilpatrick LLP be disqualified from representing Plaintiff in this case if Mr. Cain is disqualified?

3. Kilpatrick LLP and Mr. Cain were integrally involved in the drafting of Plaintiff's complaint and Plaintiff's currently-pending motion for a preliminary injunction. If Kilpatrick LLP and Mr. Cain are disqualified from representing Plaintiff in this case, should the Court dismiss this litigation without prejudice, to allow for Plaintiff to retain new counsel in the event it elects to re-file its claims?

### IV. ARGUMENT

#### A. Governing Standard.

Attorneys practicing in this Court are held to the Code of Professional Responsibility adopted by the Supreme Court of North Carolina. L.R. 83.10e(b). North Carolina has adopted ABA Model Rule 1.9(a), which "prevents an attorney from using

9

confidential material information received from a former client against that client in current litigation." *Worley v. Moore*, 807 S.E.2d 133, 138 (N.C. 2017). The rule states:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

> 27 N.C. Admin. Code Rule 1.9(a).

"Under Rule 1.9(a), a party seeking to disqualify opposing counsel must establish that (1) an attorney-client relationship existed between the former client and the opposing counsel such that confidential information would normally have been shared; (2) the present action involves a matter that is the same as or substantially related to the subject of the former client's representation, making the confidential information previously shared material to the present action; and (3) the interests of the opposing counsel's current client are materially adverse to those of the former client." *Worley*, 807 S.E.2d at 138-39. Once these factors are met, Bion need not show that Mr. Cain even communicated any confidential information to PLD. "If it is determined that an attorney-client relationship existed and that the matters are determined to be substantially related, then an irrebuttable presumption arises that relevant confidences were exchanged so that the attorney and the attorney's law firm must be disqualified." *Plant Genetic Sys., N.V. v. Ciba Seeds*, 933 F. Supp. 514, 517 (M.D.N.C. 1996).

Case 1:17-cv-01154-NCT-JLW   Document 37   Filed 01/10/18   Page 10 of 21

**B. Mr. Cain Must Be Disqualified From Representing PLD In This Action Under North Carolina Rule Of Professional Conduct 1.9(a).**

      1. <u>An Attorney-Client Relationship Existed Between Mr. Cain And Bion, As Successor To Banner, Such That Confidential Information Would Normally Have Been Shared.</u>

As Banner's former General Counsel, there is no genuine dispute that an attorney-client relationship existed between Mr. Cain and Banner, such that Banner's confidential information would normally have been shared with Mr. Cain. The issue presented is whether Bion succeeded to Banner's status as Mr. Cain's former client on account of Bion's purchase of Banner's generic pharmaceutical product business. It did.

In assessing whether an acquirer inherits the status of a "former client" for disqualification purposes, courts have generally looked to whether the attorney-client privilege changed hands in the acquisition. *USI Ins. Servs., LLC v. Ryan*, 2014 WL 3054278, at *4 (N.D. Ind. July 7, 2014) (collecting cases). To make this determination, "courts should examine whether the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management, and if they do, the attorney-client privilege will follow as well." *Id.* (collecting cases) (internal quotation omitted); *see also Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004)*; Parus Holdings, Inc. v. Banner & Witcof, Ltd.,* 585 F.Supp.2d 995, 1002 (N.D. Ill. 2008); *John Crane Prod. Sols., Inc. v. R2R & D, LLC*, 2012 WL 1694084, at *1-2 (N.D. Tex. May 15, 2012); *Tekni–Plex, Inc. v. Meyner and Landis*, 89 N.Y.2d 123, 132-135 (1996). "In determining whether the 'practical consequences' of a given transaction result in the 'transfer of control,' courts

should consider such factors as the extent of the assets acquired, including whether stock was sold, whether the purchasing entity continues to sell the same product or service, [and] whether the old customers and employees are retained. . . ." *USI Ins. Servs., LLC*, 2014 WL 3054278, at *4 (internal quotation omitted). Accordingly, even where less than an entire company is acquired, the attorney-client privilege passes where the transaction "result[s] in the transfer of control of [the predecessor's] business and the continuation of that business under new management. . . ." *Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc.*, 240 F.R.D. 401, 407 (N.D. Ill. 2007). Commentators have described this as a "transpositional" attorney-client relationship. *See* Henry Sill Bryans, Bus. Successors & the Transpositional Attorney-Client Relationship, 64 Bus. Law. 1039 (2009).

Given the focus on "practical consequences," courts consistently affirm the transfer of privilege where, like here, the acquiring company acquires a whole business line and continues to operate it. In *Martinez-Hernandez*, for example, the court held that the "attorney-client and work-product privileges" transferred to an acquirer where, as here, the acquirer entered into a purchase agreement that encompassed "books, records, and other sales, general and administrative assets" relating to a particular business line being sold. *Martinez-Hernandez v. Butterball, LLC*, 2011 WL 4549101, at *3 (E.D.N.C. Sept. 29, 2011). Courts outside of the Fourth Circuit are in accord. *See, e.g., Soverain Software LLC*, 340 F. Supp. 2d at 763 (privilege transferred where acquirer "not only acquired certain assets but also continued to operate the [acquired] business," as evidenced by its retention of patent rights, continuing contracts with customers, and

transfer of certain employees in acquisition); *UTStarcom, Inc. v. Starent Networks, Corp.*, 2009 WL 4908579, at *5 (N.D. Ill. Feb. 20, 2009) (privilege transferred where acquirer "continue[d] to operate the business enterprise" and retained certain employees).

Two cases are particularly instructive. In *USI*, a regional insurance company successfully invoked an attorney client-privilege it acquired through an acquisition of a single insurance branch, even though the entity that sold the assets—Wells Fargo—continued to exist independently on a larger scale. *USI Ins. Servs., LLC*, 2014 WL 3054278, at *4. The acquisition was more than a mere transfer of assets, the court concluded, because the acquirer continued to operate "the same type of insurance business," retaining many of the same employees and clients. *Id.* Likewise, in *Graco*, the acquirer did not purchase "all of the [seller's] assets," but instead "certain assets and liabilities relating to [the] products business" at issue in the litigation. *Graco Children's Prod., Inc. v. Regalo Int'l LLC*, 1999 WL 553478, at *4 (E.D. Pa. July 29, 1999). The court held that the privilege transferred, as the counsel's prior representation "was in the interest of those assets that [acquirer] has in its possession now." *Id.*

Consistent with these authorities, the "practical consequences" of Bion's acquisition of Banner's generic pharmaceutical product business was "the transfer of control of the business and the continuation of the business under new management." *Am. Int'l Specialty Lines Ins. Co.*, 240 F.R.D. at 407. Bion did not just acquire an isolated set of assets from Banner. Instead, it acquired Banner's generic pharmaceutical product business, including (among other things) regulatory approvals, outstanding purchase

13

orders, liabilities, inventory, patents, customer and prospective customer lists, research and development files, and supplier lists and records. Ex. 4 ¶ 2.1(a) (Bion-Banner Purchase Agreement). Banner agreed not to compete with the business being sold, which ensured a smooth transition to Bion. *See id.* ¶ 6.14(a). Also, as in the cases cited above, Bion ███████████████████████ from the business it acquired, and continued to work with the same suppliers to serve the same customers, including PLD itself. *See id.* ¶¶ 2.1(a), 6.7(a); ECF No. 7-1 at 1 (Letter to PLD re Banner Sale). [2]

Even PLD concedes that "Banner sold its generic pharmaceutical *business* to Bion," and that the parties' current business is merely a continuation of the business undertaken between Banner and PLD's predecessor, PLD-NY. ECF No. 34 at 4 n.2, 11 (PLD's Motion for Prelim. Inj.) (emphasis added). Further, as in *Graco*, the business Bion acquired is the very business a part of which is now relevant in this litigation. Any advice that Mr. Cain provided PLD relating to Banner's business thus "was in the interest of those assets" that Bion now has in its possession—including the very Agreements that form the basis for this action. *Graco Children's Prod., Inc.*, 1999 WL 553478, at *4.

---

[2]     Moreover, nothing in the agreement between Bion and Banner suggested an intention *not* to transfer the attorney-client privilege. Under Delaware law, which governed the purchase agreement between Bion and Banner, *see* Ex. 4 ¶ 11.11(a), the attorney-client privilege presumptively transfers in merger transactions absent "negotiated special contractual agreements" to prevent such transfer. *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155, 160 (Del. Ch. 2013). Here, far from retaining privilege, Banner agreed to provide Bion with "*all* records (whether in written or other form) of any kind . . . related to the Transferred Assets or Assumed Liabilities," and even agreed to make its legal team available to Bion during a transitional period following the acquisition. *See* Ex. 4 at ¶ 2.1(a)(x) (Bion-Banner Purchase Agreement) (emphasis added); Ex. 6 at Schedule A, page 4 (Transition Services Agreement).

2. <u>The Present Action Involves A Matter That Is The Same As Or Substantially Related To The Subject Of Mr. Cain's Former Representation Of Banner, Making The Confidential Information Previously Presumptively Shared With Him Material To This Action</u>

Mr. Cain apparently provided Banner with substantive legal advice relating to its commercial contracts, including the Agreements now at issue in this case. This advice "substantially relates" to the present litigation, which concerns the *same* Agreements with which Mr. Cain previously was involved while at Banner. *See* 27 N.C. Admin. Code Rule 1.9, Comments ("Under this Rule, for example, a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client. . . . Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."). Indeed, the extent of Bion's obligations under the Agreements is one of the central issues in this action, and is the very topic that Mr. Cain purports to address in his declaration on behalf of PLD. ECF No. 22 ¶ 8 (Cain Decl.).

Moreover, given his broad responsibilities as General Counsel "for overall legal affairs," including "[s]trategic negotiations" and "commercial contracts," there is likely other confidential information that Mr. Cain acquired while at Banner that is substantially related to the present litigation. In *SuperGuide*, for example, the "substantially related" element was satisfied where an attorney served for five years as "lead, national trial counsel" for a former client, and thus "became thoroughly educated about [the former

15

client's] licensing arrangements, patents and internal operations," which "would be useful during cross-examination of [the former client's] witnesses. . . ." *SuperGuide Corp. v. DirecTV Enters., Inc.,* 141 F. Supp. 2d 616, 621–23 (W.D.N.C. 2001). The attorney was thus disqualified even where he "was not involved with the negotiation" of the agreement at issue in the case, "and never prosecuted an action on behalf of [the former client] involving the [same] field of use [at issue]." *Id.* These principles apply with even greater force to general counsels, who—by the nature of their position—are exposed to a large amount of sensitive and confidential internal information during their tenure.[3]

At a bare minimum, any confidential information that Mr. Cain learned regarding the Agreements in his capacity as Banner's General Counsel is certainly material to this action. In sum, the present action and Mr. Cain's prior representation concern the same matter—commercial contracts between PLD's and Bion's predecessors.

3. <u>The Interests Of PLD Are Materially Adverse To Those Of Banner And Bion, As Successor To Banner.</u>

The third element of disqualification under Rule 1.9(a)—material adversity between the current and former client—is also satisfied here, as PLD and Bion are opposing parties in this litigation. *See Simpson Performance Prod., Inc. v. Robert W.*

---

[3]     *See, e.g., Barker v. Prof'l Educators of Tenn.*, 2012 WL 1900920, at *3-6 (M.D. Tenn. May 23, 2012) (inferring that former general counsel obtained confidential information during his eleven-year tenure at former employer, despite assurances to the contrary, because he was "privy to discussions" by the nature of his position covering a wide range of topics); *cf. Kinzer v. Remington Arms Co., Inc.*, 2010 WL 11451120, at *3 n.1 (W.D. Okla. May 10, 2010) (holding that "[i]t may reasonably be inferred . . . [that counsel] acquired confidential information during his [prior] representation," even absent evidence proving so, given the "nature of the services the lawyer provided the former client") (internal quotations omitted).

16

*Horn, P.C.*, 92 P.3d 283, 288 (Wyo. 2004) (it is clear that parties are materially adverse "when a lawyer is representing a new client who is suing a former client").

### C. Kilpatrick LLP Should Also Be Disqualified, And The Court Should Dismiss This Lawsuit Without Prejudice, So That PLD Can Retain New Counsel If It Elects To Re-File Its Claims.

PLD's outside counsel has been in communication with Mr. Cain regarding this litigation, as Mr. Cain has now verified PLD's complaint and submitted a declaration in support of PLD's motion for a preliminary injunction. Under such circumstances, the disqualification of Mr. Cain also extends to Kilpatrick LLP.

It would defeat the purpose of Rule 1.9(a) if a conflicted in-house counsel could simply convey his knowledge to outside counsel (who he likely retained), without any remedy left as to the outside counsel. Under Rule 1.10(c), "[w]hen a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under Rule 1.9 unless" adequate screening procedures are put in place. 27 N.C. Admin. Code Rule 1.10; *see also Furbush v. Otsego Mach. Shop, Inc.*, 914 F. Supp. 1275, 1282 (E.D.N.C. 1996) (noting a trend of "liberalizing the rules of imputed disqualification"). The same principle applies here— there is no indication that Mr. Cain was screened from this matter; to the contrary, he has apparently been actively advising PLD. It should make no difference that he has acted in the capacity of in-house counsel, rather than as a member of Kilpatrick LLP. In either case, disqualification of Kilpatrick LLP is warranted. In *Dynamic 3D*, for example, the disqualification of in-house counsel under the Texas equivalent of Rule 1.9(a) extended

17

to outside counsel as well, where the in-house counsel had "involvement" in the selection of outside counsel and had "communicated confidential information not only to other in-house counsel but also to outside counsel. . . ." *Dynamic 3D Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.)*, 837 F.3d 1280, 1290 (Fed. Cir. 2016).

On account of the foregoing, the Court should dismiss this lawsuit without prejudice, so that PLD can retain new counsel to re-file a new complaint if it elects to proceed with its claims. PLD's use of Mr. Cain to verify its complaint infects this entire lawsuit, as does Kilpatrick LLP's communication and interaction with Mr. Cain relating to the facts of this case. Absent dismissal, any new counsel could pick up the tainted complaint and continue to use Bion's confidential information against it. The only way to remedy the violation is to have PLD retain new counsel, with Mr. Cain and Kilpatrick LLP entirely excluded from the process. The decision in *Dynamic 3D* is again instructive. After disqualifying the plaintiff's in-house and outside counsel, the court affirmed the trial court's dismissal of the complaint without prejudice. *Id.* at 1291. The court noted that the plaintiff would need time to "retain new outside counsel" and "manage the re-filing of the complaint," and held that—absent dismissal—"the potential for prejudice would continue from the improper use of [the defendant's] confidential information in preparing the original pleadings." *Id.* Thus, "forcing [the plaintiff] to break new ground with a fresh complaint and clean docket rather than to continue drawing from a poisoned well was not an abuse of discretion." *Id.* This reasoning applies with equal force here.

## V.  CONCLUSION

For the foregoing reasons, Bion respectfully requests that Mr. Cain and Kilpatrick Townsend & Stockton LLP be disqualified from representing Plaintiff in this action. Defendants also request the dismissal of the Cain-Verified Complaint without prejudice, so that PLD can retain new counsel in the event it elects to re-file this litigation.

This the 10th day of January, 2018.

ELLIS & WINTERS LLP

/s/ Jon Berkelhammer
Jon Berkelhammer
N.C. State Bar No. 10246
Joseph D. Hammond
N.C. State Bar No. 45657
Post Office Box 2752
Greensboro, NC 27402
jon.berkelhammer@elliswinters.com
joe.hammond@elliswinters.com
Telephone: 336-217-4193
Facsimile:  336-217-4198

Troy Shelton
N.C. State Bar No. 48070
Sean Fernandes
N.C. State Bar No. 50699
4131 Parklane Avenue, Suite 400
Raleigh, NC 27612
Telephone: 919-865-7000
Facsimile: 919-865-7010

*Attorneys for Defendants Bionpharma Inc. and Bionpharma Healthcare LLC*

19

## CERTIFICATE OF COMPLIANCE WITH LR 7.3(d)

The undersigned attorney hereby certifies that this Brief complies with LR 7.3(d) of the Rules of Practice and Procedure of the United States District Court for the Middle District of North Carolina with respect to its length. This Brief was created using Microsoft Word. Based upon the word count of Microsoft Word, this Brief contains less than 6,250 words exclusive of the caption, signature block, Certificate of Service, and this Certification of Compliance.

/s/ Jon Berkelhammer

Jon Berkelhammer
N.C. State Bar No. 10246
ELLIS & WINTERS LLP
Post Office Box 2752
Greensboro, NC 27402
jon.berkelhammer@elliswinters.com
Telephone: 336-389-5683
Facsimile: 336-217-4198

*Attorney for Defendants Bionpharma Inc.*
*and Bionpharma Healthcare LLC.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 10, 2018, the foregoing document, along with all exhibits thereto, was served on the following counsel of record via the Court's electronic filing system:

> Daniel R. Taylor, Jr.
> Susan H. Boyles
> Phillip A. Harris
> KILPATRICK TOWNSEND & STOCKTON LLP
> 1001 West Fourth Street
> Winston-Salem, NC 27101-2400
> dantaylor@kilpatricktownsend.com
> sboyles@kilpatricktownsend.com
> pharris@kilpatricktownsend.com
>
> *Attorneys for Plaintiffs*

/s/ Jon Berkelhammer
Jon Berkelhammer
*Attorney for Defendants*