# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| P&L DEVELOPMENT LLC,<br><br>              Plaintiff,<br>v.<br><br>BIONPHARMA INC. and<br>BIONPHARMA HEALTHCARE LLC,<br><br>              Defendants. | 1:17CV1154 |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Disqualify Charles Cain and Kilpatrick Townsend & Stockton LLP [Doc. #36].[1]  For the reasons explained below, Defendants' Motion to Disqualify is denied.

### I.

This action began in December 2017 when Plaintiff P&L Development LLC ("PLD") sued Defendants Bionpharma Inc. and Bionpharma Healthcare LLC (collectively "Bion") alleging claims for breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive trade practices. (See Verified Compl. [Doc. #7].)  In January 2018, PLD moved for a temporary restraining order and preliminary injunction, and the temporary restraining order was granted in limited part.  Prior to the scheduled hearing on the preliminary injunction and other matters, the parties reached an agreement on the preliminary

---

[1] The other pending motions will be addressed in a separate order.

injunction. During the hearing, their motion for a stay until June 1, 2018 was granted, and Bion's motion to disqualify was taken under consideration. After the period of stay ended and Bion filed its Answer and Counterclaim, PLD amended its complaint by modifying the factual and legal allegations and adding a claim of fraud. (Am. Compl. [Doc. #126].)

II.

A.

Bion has moved to disqualify Charles Cain and Kilpatrick Townsend & Stockton LLP ("Kilpatrick") from representing PLD in this action and for a dismissal of the action without prejudice. At the heart of this motion are four supply agreements initially entered into by P & L Developments of New York Corporation ("P&L Corp."), PLD's predecessor, and Banner Pharmacaps, Inc. ("Banner") between 2003 and 2012, according to which Banner would manufacture, imprint, and bulk package pharmaceuticals which P&L Corp. would then market and sell as a private label or store brand. (See Ex. C to Am. Compl., Ibuprofen Supply Agreement; Ex. D to Am. Compl., Naproxen Supply Agreement; Ex. E to Am. Compl., Cetirizine Supply Agreement; Ex. F to Am. Compl., Loperamide Supply Agreement (collectively "Agreements").)

Since September 2016, Cain has served as General Counsel for PLD. (Decl. of Charles L. Cain ¶ 1 (Jan. 18, 2018).) However, from August 2000 to March 2013, he was General Counsel for Banner and was responsible for the company's legal and human resources affairs. (Id. ¶ 2; see also Ex. 1 to Br. in Supp. of Mot.

to Disqualify ("Defs.' Br. in Supp."), Charles Cain, Linkedin (describing responsibilities at Banner as including "[s]trategic negotiations, . . . compliance, commercial contracts, intellectual property value maximization and protection, complex dispute resolution . . .").) As one would expect considering Cain's self-described responsibilities at Banner, he played a role at least in the execution of the Agreements on behalf of Banner. For example, after P&L Corp. executed the Ibuprofen Agreement in 2003, it was returned to Cain with a cover letter saying, in part, "Thank you for all of your help in finalizing this matter." (Ex. 2 to Defs.' Br. in Supp., Letter from David Gruber to Cain (May 12, 2003).) On behalf of Banner, Cain approved the First Amendment to the Ibuprofen Agreement, signed the Second Amendment and initialed its Appendix A, and approved the Third Amendment. (Ibuprofen Agreement, First Amendment at 2, Second Amendment at 3, 4, & Third Amendment at 4.) He transmitted the executed Loperamide Agreement to P&L Corp.'s counsel. (Ex. 3 to Defs.' Br. in Supp., Letter from Cain to Gruber (Jan. 3, 2005).) And, he approved the Cetirizine and Naproxen Agreements on behalf of Banner. (Cetirizine Agreement at 25[2]; Naproxen Agreement at 25.)

---

[2] Bion also cites to page 2 of the First Amendment to the Cetirizine Agreement, but those initials do not appear to be Cain's. (Compare Cetirizine Agreement, First Amendment at 2 with Ibuprofen Agreement, First Amendment at 2 & Ibuprofen Agreement, Third Amendment at 4.)

In December 2012, Banner was sold to Patheon in a stock sale[3], (Cain Decl. ¶ 3), after which Cain was placed on administrative leave and performed no further legal work for Banner or Patheon, (id.). His employment with Banner officially terminated in March 2013. (Id.) Banner continued to exist, and, in November 2014, a new legal entity, Banner Life Sciences LLC ("BLS"), was formed as a wholly-owned subsidiary of Banner and to which the Agreements, among other assets, were transferred. (See Ex. 7 to Defs.' Br. in Supp. & Ex. A to Cain Decl., Letter from BLS to P&L Corp. (Dec. 5, 2014).) The manufacturing facility in High Point, North Carolina would continue to operate as usual under the Banner legal entity. (Id.) In November of the following year, BLS sold its generic pharmaceutical product business to Bionpharma, Inc., but the products subject to the Agreements would continue to be manufactured at Patheon's High Point, North Carolina facility. (Ex. 1 to Compl., Letter from BLS to P&L Corp. (Nov. 12, 2015); see also Ex. 4 to Defs.' Br. in Supp., Purchase Agreement by and among Banner Life Sciences LLC, Bionpharma Inc., and Banner Life Sciences Holdings Coöperatif U.A. (Nov. 7, 2015) (describing the transferred assets as sufficient to conduct BLS's "generic pharmaceutical product business involving . . . development, manufacture, marketing, distribution and sale").)

---

[3] The relationship between Banner and Patheon has not been made clear; however, the Court has endeavored to present that relationship, along with that including Banner Life Sciences LLC, as the limited evidence on this topic reflects them to be.

In September 2016, PLD, which had acquired from P&L Corp. all rights under the Agreements after it was formed in November 2013 when P&L Corp. reorganized, hired Cain as its General Counsel. There is no dispute that Cain has played a role in the instant action against Bion. In November 2017, he contacted Kilpatrick to retain the firm, which serves as counsel of record for PLD in the instant action. (Decl. of Cain ¶ 10; Decl. of Susan H. Boyles ¶ 3 (Jan. 19, 2018); Decl. of Daniel R. Taylor, Jr. ¶ 3 (Jan. 19, 2018).) When PLD instituted this suit, Cain – "acquainted with all of the facts and circumstances stated therein" – verified the contents of the original complaint as true or believed to be true, (see Verified Compl., Verification), and he provided a declaration in support of PLD's motion for injunctive relief, (see Decl. of Charles L. Cain (Jan. 2, 2018)).

Bion argues that Cain must be disqualified from representing PLD in this action. Its reasoning: the attorney-client relationship between Banner and Cain transferred from Banner to Bion and the present action involves a matter that is the same or substantially related to the subject matter of Cain's former representation of Banner. Thus, Bion argues, any confidential information previously shared between Banner and Cain is material to this action. (Defs.' Br. in Supp. at 11-17.) In addition, because Cain must be disqualified, so, too, must Kilpatrick. (Id. at 17-18.)

In response, PLD argues that the attorney-client privilege between Banner and Cain did not transfer to Bion and, even if it had, Bion has not shown that Cain has relevant material and confidential information about the Agreements. (Mem. of

Law in Opp'n to Defs.' Mot. ("Pl.'s Br. in Opp'n") at 9-22.) The Agreements, PLD argues, are unambiguous as a matter of law and speak for themselves. (Id. at 3, 20.) PLD also asserts that Kilpatrick has received no material or confidential information from Cain such that it should be disqualified. (Id. at 22-23.) Cain himself avers that he has not divulged to Kilpatrick "any information relating to the negotiation or drafting of the" Agreements, "any information related to Banner's strategy or decision-making that went into the negotiation of the" Agreements, or "any information . . . that [he] would consider to be 'confidential' related to those [Agreements] or that was protected by Banner's attorney-client privilege". (Decl. of Cain ¶ 11.) Susan Boyles and Daniel Taylor of Kilpatrick state the same. (Decl. of Boyles ¶¶ 5, 6; Decl. of Taylor ¶¶ 5, 8.) PLD also contends that Bion "acquiesced to Cain's involvement and waived [its] right to seek his disqualification now" because it failed to raise the issue of a conflict of interest prior to this lawsuit. (Pl.'s Br. in Opp'n at 21.)

Bion replies that it does hold the status of Cain's former client, and it need not show the actual existence or use of confidential information nor the relevance of confidential information Cain actually possesses. (Defs.' Reply Br. in Supp. of Mot. to Disqualify ("Defs.' Reply Br.") at 4-6, 7-11.) Because Bion disagrees with Cain's characterization of the Agreements, it argues that parole evidence may be relevant. (Id. at 6.) Moreover, according to Bion, PLD could "exploit" Cain's confidential information to "shape discovery efforts, refine lines of cross examination, or craft arguments." (Id. at 6-7.) As for PLD's position that Bion has

waived the issue, Bion contends that it raised the issue of disqualification nine days after PLD filed this action. (Id. at 11.)

B.

As an initial matter, Bion did not waive its right to move to disqualify Cain (or Kilpatrick). Courts evaluate a number of factors to determine if a party has waived its objection to counsel's conflict of interest, including whether there has been a delay in objecting to the conflict and reasons for such delay, when the party learned of the conflict, whether it had counsel during that time, whether the objection is strategic, and whether disqualification would prejudice the other party. In re Modanlo, 342 B.R. 230, 236-37 (D. Md. 2006). PLD focuses on the timeliness of Bion's motion. It argues that "Cain has been communicating with Bion about its alleged breach for months" and "at no time prior to the filing of this lawsuit did Bion contend that Cain had a conflict of interest." (Defs.' Br. in Supp. at 21 (citing communications Cain had with Bion's General Counsel at the end of November 2017 about Bion's failure to ship PLD's products).) Thus, PLD contends, Bion waived any objection it had to Cain's representation of PLD. Id.

Undue delay filing a motion to disqualify after the commencement of suit can be considered a waiver of the conflict of interest. See, e.g., Rohm & Haas Co. v. Am. Cyanamid Co., 187 F. Supp. 2d 221, 231 (D.N.J. 2001) (finding waiver where two years and five months had passed between the commencement of suit and filing of the motion to disqualify and citing other federal courts finding waiver after delays of thirteen months, fifteen months, one year and nine months, two

7

years, over two years, two and a half years, almost three years, and three years). Here, there was no undue delay in seeking to disqualify Cain. His November 2017 communications with Bion's General Counsel prior to the institution of this action in no way suggest that Bion unduly delayed filing its motion to disqualify in January 2018. Furthermore, Bion moved to disqualify Cain less than three weeks after commencement of this suit, (see Verified Compl. (Dec. 22, 2017) & Mot. to Disqualify (Jan. 10, 2018)), and just eight days after PLD moved for injunctive relief, (see Mot. for TRO &/or Prelim. Inj. (Jan. 2, 2018)), after having already advised Kilpatrick of the "serious issues" raised by Cain's employment with PLD, (see Ex. 8 to Defs.' Reply Br., Letter from Jon Berkelhammer to Daniel R. Taylor, Jr. (Dec. 31, 2017)). Although Bion could have moved to disqualify Cain sooner, it cannot be said that it unduly delayed in doing so.

C.

"The Code of Professional Responsibility adopted by this Court is the Code of Professional Responsibility adopted by the Supreme Court of North Carolina, . . . except as otherwise provided by a specific rule of this Court." L.R. Civ. P. 83.10e(b). Rule 1.9(a) of North Carolina's Rules of Professional Conduct prohibits "[a] lawyer who has formerly represented a client in a matter" from "thereafter represent[ing] another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." 27 N.C. Admin. Code 2.1, Rule1.9(a) ("N.C.R. Prof. Conduct"). "The rule prevents an

attorney from using confidential material information received from a former client against that client in current litigation." Worley v. Moore, 807 S.E.2d 133, 138 (N.C. 2017).

"Disqualification is a serious matter which cannot be based on imagined scenarios of conflict". Plant Genetic Sys., N.V. v. Ciba Seeds, 933 F. Supp. 514, 517 (M.D.N.C. 1996). "The drastic nature of disqualification requires that courts . . . always remain mindful of the opposing possibility of misuse of disqualification motions for strategic reasons." Shaffer v. Farm Fresh, Inc., 966 F.2d 142, 146 (4th Cir. 1992).

Accordingly, the moving party must meet "a high standard of proof". Plant Genetic Sys., N.V., 933 F. Supp. at 517. It must show that

> (1) an attorney-client relationship existed between the former client and the opposing counsel in a matter such that confidential information would normally have been shared; (2) the present action involves a matter that is the same as or substantially related to the subject of the former client's representation, making the confidential information previously shared material to the present action; and (3) the interests of the opposing counsel's current client are materially adverse to those of the former client.

Worley, 807 S.E.2d at 138-39. Here, there is no dispute that an attorney-client relationship existed between Banner and Cain such that Cain would be privy to confidential information. Nor is there a dispute that the interests of PLD are materially adverse to Bion's. At issue is whether Banner's attorney-client privilege with Cain transferred to Bion and, if so, whether this matter is the same or substantially related to the subject of Cain's representation of

9

Banner such that confidential information Banner would have shared with Cain is material to this action.

D.

Even if Bion could meet its burden of showing that Banner's attorney-client privilege with Cain transferred to Bion, see, e.g., Soverain Software LLC v. Gap, Inc., 340 F. Supp. 2d 760,763 (E.D. Tex. 2004) (explaining that "[i]f the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management" then, so, too, does the attorney-client privilege transfer), Bion has not met its burden of showing that this matter is the same or substantially related to the subject of Cain's representation of Banner such that confidential information that Cain would have acquired as Banner's General Counsel is material to this action.

"A former client must objectively demonstrate 'a substantial risk that [confidential] information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.'" Worley, 807 S.E.2d at 140 (quoting N.C.R. Prof. Conduct 1.9 cmt. 3) (alteration in original); see also id. at 139 (explaining that once the court has determined that confidential information would normally have been shared in the past representation, it must determine "whether that information is material to the present action"). "The test does not rely on the subjective assessment provided by the former client or the attorney." Id.

When the former client is an organization, "knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." N.C.R. Prof. Conduct 1.9 cmt. 3. Yet, "a former client is not required to reveal the information learned by the lawyer to establish a substantial risk that the lawyer has information to use in the subsequent matter." Id. Accordingly, "[a] conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." Id. cited in Worley, 807 S.E.2d at 140; see also Restatement (Third) of the Law Governing Lawyers § 132A cmt. d(iii) (avoiding disclosure of confidential information "by focusing on the general features of the matters involved and inferences as to the likelihood that confidences were imparted by the former client that could be used to adverse effect in the subsequent representation") cited in Worley, 807 S.E.2d at 140. "When the prior matter did not involve litigation, its scope is assessed by reference to the work that the lawyer undertook and the array of information that a lawyer ordinarily would have obtained to carry out that work." Restatement (Third) of the Law Governing Lawyers § 132A cmt. d(iii). Information "may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related." N.C.R. Prof. Conduct 1.9 cmt. 3.

"[D]isqualification . . . may not be rested on mere speculation that a chain of events whose occurrence theoretically could lead counsel to act counter to his client's interests might in fact occur." Shaffer, 966 F.2d at 145 (vacating the district court's disqualification when it "pointed to no objective indicators that the chain of events it hypothesized might occur were even incipiently underway, or would 'likely' occur" and "simply . . . assume[d] the complete unfolding of a series of discrete events, no one of which could be more than the basis of speculation at this point").

At first glance, Bion's position seems persuasive. As Banner's successor to the Agreements – the final versions of which were either circulated to P&L Corp. by Cain, signed by Cain, and/or approved by Cain on behalf of Banner, Bion is being sued for breach of those same Agreements by PLD whose General Counsel is none other than Cain. Therefore, Bion insists that Cain's "substantive legal advice [to Banner] relating to its commercial contracts" "'substantially relates' to the present litigation, which concerns the same Agreements with which [] Cain previously was involved while at Banner." (Defs.' Br. in Supp. at 15.) Bion contends that "the extent of Bion's obligations under the Agreements is one of the central issues in this action, and is the very topic that [] Cain purports to address in his declaration on behalf of PLD." (Id.)

In support of its argument, Bion cites SuperGuide Corp. v. DirecTV Enters., Inc., 141 F. Supp. 2d 616 (W.D.N.C. 2001) ("2000 Action"), in which the court found the matters were substantially related and disqualified counsel. SuperGuide

sued various defendants for patent infringement, and two of those defendants sued Gemstar which moved to disqualify SuperGuide's counsel, Roderick Dorman. Id. at 617. SuperGuide was the owner of patents related to electronic program guide technology used in television and movie theaters and licensed two of the patents to Gemstar in 1993, including the right to sue for infringements of those patents. Id. at 617, 618. At the time, Dorman "served as Gemstar's lead, national trial counsel in substantially all patent infringement litigation that was initiated by Gemstar". Id. at 618. During his work from 1993 to 1999 for Gemstar, he litigated numerous lawsuits involving only the cable television field of use, including a suit against StarSight for patent infringement for selling electronic programming guides to cable operators. Id. at 618, 619. After Gemstar terminated Dorman in October 1999, SuperGuide contacted him to represent the company in the 2000 Action. Id. at 619. In turn, he analyzed SuperGuide's license provisions for the scope of retained rights and then filed suit on its behalf. Id.

One issue in the 2000 Action was which field of use the terms of the license agreement reserved to SuperGuide. Id. at 617. Gemstar argued that SuperGuide reserved to itself only the field of use involving transmission of satellite signals, while SuperGuide contended that it reserved the entire satellite field of use and only licensed to Gemstar the cable television field of use. Id. at 618. In 1994, though, while representing Gemstar, Dorman had determined that SuperGuide had not licensed all of its patent rights to Gemstar, a position adverse to Gemstar's contention in the 2000 Action. Id. at 622. He had also represented Gemstar in

13

lawsuits involving the same patents at issue in the 2000 Action and, in 1999, when he still represented Gemstar, SuperGuide had demanded that he be excluded from representing Gemstar in licensing negotiations because he had so much knowledge about SuperGuide's patents and Gemstar's enforcement of them. Id.

The court disqualified Dorman after it found that he had "crucial knowledge" of the course of conduct under the license agreement which would be useful to SuperGuide during cross-examination of Gemstar witnesses about the scope of the patent and personal knowledge of SuperGuide's patent enforcement in both the satellite and cable fields. Id. at 622, 623. There was also a possibility that Dorman would become a witness, "another factor which precludes his representation of SuperGuide." Id. at 622.

Bion also cites, albeit in support of disqualifying Kilpatrick, Dynamic 3D Geosolutions LLC v. Schlumberger Ltd., 837 F.3d 1280 (Fed. Cir. 2016), in which the court disqualified in-house and outside counsel. Charlotte Rutherford began working for Schlumberger in 2006 in a senior counsel position as Manager of Intellectual Property Enforcement in licensing and litigation, was promoted to Director of Intellectual Property, and was promoted again to Deputy General Counsel for Intellectual Property. Id. at 1282. In those positions, she developed and implemented worldwide intellectual property strategy, protected the company's intellectual property, and advised senior company executives about intellectual property risk issues. Id. She was also responsible for the company's worldwide program of enforcing its intellectual property. Id. Particularly relevant

14

was her work with the company's software platform, Petrel, which involved not only managing a lawsuit involving Petrel, but also assessing additional patentable aspects of Petrel and risks of lawsuits against it – a project known as Goldstar. Id. As part of Goldstar, the company analyzed a competitor's product, RECON software, for which the competitor received a patent ("the '319 Patent") in 2011. Id.

In mid-2013, Rutherford left Schlumberger and began working as Senior Vice President and Associate General Counsel at Acacia Research Group LLC ("Acacia"). Id. Soon after joining Acacia, Rutherford met twice with the '319 Patent inventors to discuss the company's acquisition of the patent and possible litigation, including against Schlumberger's Petrel product for patent infringement. Id. She participated in a telephone call with outside counsel and one of her subordinates about the '319 Patent, and, as she did with the '319 Patent inventors, discussed Petrel as a target for patent infringement litigation. Id. Outside counsel and Rutherford's subordinate then recommended that Acacia acquire the '319 Patent and sue Schlumberger and others, a recommendation with which Rutherford agreed or approved. Id. Acacia acquired the '319 Patent and formed Dynamic 3D as a patent-holding entity to which the '319 Patent was assigned. Id. at 1282-83.

In February 2014, Dynamic 3D sued Schlumberger for infringing the '319 Patent with its use and sale of Petrel and alleged that the company had actual knowledge of the '319 Patent as early as its issuance in July 2011. Id. at 1283.

15

Schlumberger moved to disqualify Dynamic 3D's counsel, including Rutherford. Id. The Federal Circuit affirmed the district court's disqualification of Rutherford, finding that her work for Schlumberger and for Acacia and Dynamic 3D were substantially related. Id. at 1286. The court not only gave weight to her positions within Schlumberger, but also her work as part of the Goldstar project, assessing patentable aspects of Petrel and risks of lawsuits against it, and her "efforts to license Petrel when the later-accused features of the product existed in the older versions with which Rutherford was involved." Id. As the court described it, Rutherford was not only "intimately knowledgeable concerning a particular product, its competitors, and its associated business strategies and intellectual property," but then "in fact played a significant role in acquiring a patent used to accuse her former employer's product of patent infringement." Id. at 1287.

This case is readily distinguishable from SuperGuide and Dynamic 3D. First, it is doubtful that information Dorman and Rutherford possessed from their previous representations was rendered obsolete by the passage of time, while it is entirely possible that confidential information Cain acquired from Banner was rendered obsolete over the years since each Agreement was executed and Banner was sold to Patheon which created BLS which then sold its generic pharmaceutical business to Bion.

Next, the confidential information Dorman and Rutherford acquired from their previous clients was irrefutably material to the actions each took on behalf of their current clients against their previous clients. In other words, there was a

16

substantial risk that confidential information each would have received in their prior representations would materially advance their current clients' positions in the subsequent matters. Dorman had previously sued on Gemstar's behalf for infringement of the same patents at issue in the 2000 Action and had taken a position on the license agreement that was adverse to Gemstar in the 2000 Action. Similarly, Rutherford had previously worked on a project designed to evaluate patentability of and litigation risks to Schlumberger's Petrel product, the very product she then accused of infringing on a patent her current client newly acquired with her approval.

Here, Banner likely shared with Cain confidential information pertaining to its pharmaceutical business that was incorporated into each of the Agreements, including Banner's manufacturing, imprinting, and bulk packaging capabilities and its marketing, distributing, and sales needs. Yet, what underlies each legal claim against Bion is its alleged diversion of Patheon's production of pharmaceuticals away from PLD for Bion's benefit as it prepared to compete against PLD once the Agreements expired. There is not a substantial risk that confidential information that Cain would normally have acquired during his representation of Banner would materially advance PLD's position in this action.

More specifically, PLD alleges that Bion breached the Agreements when it reduced or rejected purchase orders believing it was entitled to do so, intentionally withheld purchase orders, and repeatedly refused to order from Patheon or direct Patheon to ship the product PLD ordered. (E.g., Am. Compl. ¶¶ 52-53, 56-57.)

17

More generally, PLD alleges that "Bion failed to manufacture, imprint and supply – or cause to be manufactured, imprinted, and supplied" the products and "instead instructed Patheon to re-direct a portion of its manufacturing efforts . . . to making [the products] for Bion". (E.g., id. ¶ 179.) Again, there is not a substantial risk that the confidential information Cain would have acquired would materially advance PLD's position as to Bion's refusal to have Patheon manufacture products for PLD, its instruction to Patheon to manufacture products for Bion instead of for PLD, or its reduction and rejection of PLD's purchase orders. The Agreements speak for themselves, and their terms will determine whether or not Bion was permitted to do what it is alleged to have done or whether it breached those Agreements, no matter what Cain understands the Agreements to mean. See Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C., 658 S.E.2d 918, 921 (N.C. 2008) ("A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law."); Weyerhaeuser Co. v. Carolina Power & Light Co., 127 S.E.2d 539, 540 (N.C. 1962) ("When the language of a contract is clear and unambiguous, effect must be given to its terms" which "are to be taken and understood in their plain, ordinary and popular sense.").

Bion maintains that "whether the parties' dispute will require evidence of negotiation history or other parole evidence remains to be litigated" and "that Bion is entitled to litigate without a lawyer who advised the business that Bion now owns working to undermine that business on behalf of a new client." (Defs.' Br. in Supp. at 2.) However, Bion's concerns are speculative, as that is the only path

18

towards the conclusion that there is a substantial risk that confidential information Cain normally would have acquired from Banner would materially advance PLD's position here. It is worth noting, though, that PLD's criticism of Bion's failure to identify "any specific confidential information of Banner Pharmacaps that Cain presently possesses about these contracts that would be useful in the current contract dispute", (Pl.'s Br. in Opp'n at 18), is a mischaracterization of Bion's burden, as Bion is not obligated to disclose specific confidential information Cain acquired from Banner. See Worley, 807 S.E.2d at 139 (citing Restatement (Third) of the Law Governing Lawyers § 132A cmt. d(iii) for the proposition that "it would be self-defeating if, in order to obtain its protection, the former client were required to reveal in a public proceeding the particular communication or other confidential information that could be used in the subsequent representation"). Nevertheless, Bion's fears are speculative even considering the confidential information Cain would have ordinarily acquired during his representation of Banner. Therefore, the motion to disqualify Cain is denied.

Bion also moved to disqualify Kilpatrick because "[it] would defeat the purpose of Rule 1.9(a) if conflicted in-house counsel could simply convey his knowledge to outside counsel (who he likely retained), without any remedy left as to the outside counsel." (Defs.' Br. in Supp. at 17.) As preluded, in support of its motion to disqualify Kilpatrick, Bion cites Dynamic 3D, in which outside counsel was disqualified because the disqualified in-house counsel had selected outside counsel and the disqualified in-house counsel was involved in the litigation against

19

her former client, 837 F.3d at 1290. But, here, Cain is not being disqualified. Because Bion's request to disqualify Kilpatrick is borne of its argument that Cain should be disqualified, there is no reason before the Court to disqualify Kilpatrick. Therefore, Bion's motion to disqualify Kilpatrick is denied.

III.

For the reasons stated herein, IT IS HEREBY ORDERED that Defendants' Motion to Disqualify Charles Cain and Kilpatrick Townsend & Stockton LLP [Doc. #36] is DENIED.

This the 29th day of January, 2019.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge