**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| P&L DEVELOPMENT, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:17CV1154 |
| | ) | |
| BIONPHARMA, INC. and | ) | |
| BIONPHARMA HEALTHCARE LLC, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Judgment on the Pleadings as to Plaintiff's Claim for Unfair and Deceptive Trade Practices (Seventh Cause of Action) [Doc. #136]. For the reasons explained below, Defendants' motion is granted. Defendants' Motion for Judgment on the Pleadings as to Plaintiff's Claim for Unfair and Deceptive Trade Practices (Sixth Cause of Action) [Doc. #128], filed as to the initial complaint which has now been amended, is denied as moot.

I.

This action began in December 2017 when Plaintiff P&L Development LLC ("PLD") sued Defendants Bionpharma Inc. and Bionpharma Healthcare LLC (collectively "Bion") alleging claims for breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive trade practices. (See Verified Compl. [Doc. #7].) In January 2018, PLD moved for a temporary restraining order and preliminary injunction, and the temporary restraining order was granted in limited part. Prior to the scheduled hearing on the preliminary

injunction and other matters, the parties reached an agreement on the preliminary injunction.  During the hearing, their motion for a stay until June 1, 2018 was granted.

After the period of stay ended, Bion filed its Answer and Counterclaim and moved for judgment on the pleadings as to PLD's unfair and deceptive trade practices claim.  Afterwards, PLD amended its complaint by modifying the factual and legal allegations and adding a claim of fraud. (Am. Compl. [Doc. #126].)  Bion answered and once again moved for judgment on the pleadings as to PLD's unfair and deceptive trade practices claim.

II.

PLD, a Delaware limited liability company with its principal place of business in New York, and Bion, Delaware companies[1] with their principal places of business in New Jersey, were successor parties to four agreements ("Agreements") entered into in 2003, 2004, 2011, and 2012 according to which Bion and its predecessors would manufacture, imprint, and bulk package pharmaceuticals ("Products") which PLD and its predecessor would then market and sell as a private label or store brand. (Am. Compl. ¶¶ 1, 3, 4; Answer ¶¶ 3, 4; Ex. C to Am. Compl., 2003 Ibuprofen Agreement; Ex. D to Am. Compl., 2012 Naproxen Agreement; Ex. E to Am. Compl., 2011 Cetirizine Agreement; Ex. F to Am. Compl., 2004 Loperamide Agreement.)

---

[1] Bionpharma Inc. is a Delaware corporation, while Bionpharma Healthcare LLC is a Delaware limited liability company. (Am. Compl. ¶¶ 3, 4; Answer ¶¶ 3, 4.)

Each of the Agreements had a defined Term that would automatically renew at the end of the Term for one year unless a party gave the requisite written notice of non-renewal. (Ibuprofen Supply Agreement § 8.1 & Amends.; Naproxen Supply Agreement § 10.1; Cetirizine Supply Agreement § 10.1; Loperamide Supply Agreement § 8.1.) In September 2017, Bion notified PLD of its intent not to renew the Agreements "upon expiration of their current terms on March 31, 2018[2]." (Ex. B to Am. Compl., Letter from Bion to P&L Dev. of N.Y. Corp. (Sept. 11, 2017).) The Agreements obligated Bion "to provide Products to PLD at least through March 31, 2018, and later under certain Supply Agreements if outstanding firm orders were received prior to" that date. (Am. Compl. ¶ 42.) Despite this obligation, and well before notifying PLD of its intent not to renew the Agreements, Bion began reducing or rejecting PLD's orders and instructing Patheon Softgels, Inc. ("Patheon"), the manufacturer of the Products with whom Bion contracted, to redirect its manufacturing from PLD to Bion.

The Agreements called for PLD to place its orders with Bion which forwarded them to Patheon. (Id. ¶¶ 29, 30, 50, 74, 96, 113.) After Patheon manufactured the Products at its High Point, North Carolina facility, it would ship them directly to PLD. (Id. ¶¶ 50, 74, 96, 113.) However, in May 2017, Bion

---

[2] The Initial Term of the Cetirizine Agreement and the Naproxen Agreement ended on March 31, 2018. (Cetirizine Agreement § 10.1; Naproxen Agreement § 10.1.) It is not apparent from the Ibuprofen Agreement, its amendments, or the Loperamide Agreement that March 31, 2018 was their designated expiration date. However, PLD does not take issue with Bion's September 2017 letter.

began reducing or rejecting some of PLD's purchase orders for Ibuprofen and Naproxen, at times taking the position that it was entitled to do so and at other times taking the position that there was a shortage of Active Pharmaceutical Ingredient ("API") for the Products. (Id. ¶¶ 52-54, 75-76, 78-79, 137.)

In emails to PLD in October 2017, Bion rejected two purchase orders for Ibuprofen because "'there continue to remain issues with API for IBU, etc.'" and then explained that there were "'shortages in raw material'" beyond Bion's control, including the lack of "'any commitments beyond Oct supply of API'", that could "'impact [Bion's] ability to fulfill an order'". (Id. ¶¶ 221.a., 221.b.) In November, after PLD complained of Bion's purchase order rejections, Bion emailed PLD to say once again that there was a shortage of API "'due to circumstances beyond [Bion's] reasonable control'" and that Bion could not fulfill one specific purchase order "'based on the supply situation'". (Id. ¶¶ 221.c., 221.d.) Later that month, Bion's general counsel, Lavesh Samtani, spoke with PLD's general counsel, Charles Cain, who was in North Carolina at the time, and explained that Bion had not been able to supply PLD with the Products "because of an API shortage, which was out of Bion's control." (Id. ¶ 221.e.) In an email two days later, Samtani repeated to Cain, in North Carolina at the time, and others that "'due to lack of supply of materials and for reasons out of [Bion's] control", Bion could not supply Products to PLD. (Id. ¶ 221.f.)

Yet, according to Patheon's representative, there was no API shortage that impacted Patheon's ability to manufacture all of the Products PLD had ordered, had

Bion submitted the orders to Patheon. (Id. ¶¶ 61, 81, 146, 223; id. ¶¶ 56, 80 (suggesting that to the extent there was any minor shortage of API for Patheon, there was API from alternate sources).)  When PLD representatives visited Patheon's manufacturing facility on December 1, 2017, they saw "ample quantities of the necessary API to satisfy PLD's orders", "active manufacturing lines running with both Ibuprofen softgels and Naproxen softgels", and "large quantities of Ibuprofen softgels and Naproxen softgels packaged and ready for shipping with PLD's address affixed to the pallets stored in Patheon's warehouse." (Id. ¶ 141.)  PLD notified Bion of its observations, and on December 4, 2017, Samtani emailed Cain, who was in North Carolina, that "Bion was making 'reasonable and good faith efforts to supply [PLD] with all products'", denied "'withholding any products from PLD'", and stated that there was "'simply no need for PLD to go to Patheon' to check the status" of its orders. (Id. ¶ 221.h.) PLD relied on these representations when it failed to contact "alternate suppliers" because "an API shortage in the industry" made it "likely that other suppliers would be experiencing the same problem and not be able to fill any orders that PLD might place because the raw materials were not available." (Id. ¶ 228.)

In September, Bion began reducing or rejecting PLD's purchase orders for Cetirizine and Loperamide and would not direct or allow Patheon to fill those orders, taking the same position it had with the other Products – that it was entitled to do so under the terms of the Agreements. (Id. ¶¶ 97, 100, 114-117.)

Had Bion submitted the orders to Patheon, Patheon could have filled all of PLD's orders. (Id. ¶¶ 102, 120.)

When Patheon questioned why PLD's orders had fallen, Bion still did not forward the orders to Patheon. (Id. ¶ 61.) Instead, as early as July 2017, Bion began instructing Patheon to focus on making the Products for Bion and not to make them for PLD. (Id. ¶¶ 62, 83, 99, 146.) In September 2017, Bion requested Patheon create new codes and print formats to distinguish Bion's Products from PLD's. (Id. ¶¶ 63, 136.) By January 2018, Bion had received from Patheon for its own use more than 260 million Ibuprofen softgels, 36 million Naproxen softgels, 25 million Cetirizine softgels, and 22 million Loperamide softgels which it was stockpiling at a warehouse in Tennessee. (Id. ¶¶ 64, 83, 99, 119, 225.)

As a result of Bion's conduct, there was a shortage of Products which caused PLD to lose substantial sales and goodwill. (Id. ¶¶ 65, 68-70, 86, 92, 109, 126, 148, 154, 157; see also id. ¶¶ 103, 121 (alleging that the "substantial shortage of Cetirizine" and "Loperamide softgels" "hindered PLD's ability to meet its contracts with its customers").)

PLD has alleged that Bion committed unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 et seq. when it "improperly reduced or rejected PLD's orders for Products", "failed to order from Patheon 100% of the Products that PLD ordered", "falsely represented to PLD that there was a shortage of IBU-API and NAP-API in an attempt to justify its actions", "intentionally withheld finished product from PLD by directing Patheon not to ship Products manufactured

for PLD and, without cause, allowing the Products to sit in a warehouse in High Point for many months after they were ready for shipment to PLD", "sought to create an artificial shortage of . . . Products in the marketplace by refusing PLD's purchase orders", and "instructing Patheon to re-direct some of the manufacturing capacity . . . to make Products for Bion . . . so that it would have a substantial inventory of products . . . when the . . . Agreements expired". (Id. ¶¶ 236-41.)  In addition, Bion refused to ship Products in December 2017 "unless PLD provided Bion with detailed information about PLD's customers and the quantities of Products those customers have ordered." (Id. ¶ 247.)

III.

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  A court considering a motion for judgment on the pleadings must "view the facts presented in the pleadings and inferences drawn therefrom in the light most favorable to the non-moving party." Atwater ex rel. Estate of Peterson v. Nortel Networks, Inc., 394 F. Supp. 2d 730, 731 (M.D.N.C. 2005) (citing Edwards v. City of Goldsboro, 178 F.3d 231, 248 (4th Cir. 1999)).

A motion pursuant to Rule 12(c) is analyzed under the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Rules of Civil Procedure. Massey v. Ojaniit, 759 F.3d 343, 347 (4th Cir. 2014).  Therefore, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678

7

(2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556); <u>see also</u> <u>McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.</u>, 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is <u>plausible</u> on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged").  However, when a complaint states facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557).

When analyzing a Rule 12(c) motion, a court considers not only the complaint and documents explicitly incorporated by reference and attached as exhibits, but also the answer. <u>See</u> <u>Goines v. Valley Cmty. Servs. Bd.</u>, 822 F.3d 159, 166 (4th Cir. 2016); <u>Massey</u>, 759 F.3d at 347.  "The factual allegations of the Answer are taken as true only where and to the extent they have not been denied or do not conflict with the complaint." <u>Alexander v. City of Greensboro</u>, No. 1:09-CV-293, 2011 WL 3360644, *2 (M.D.N.C. Aug. 3, 2011).  Because a plaintiff is not required to respond to allegations in an answer and those allegations are deemed denied, a defendant cannot rely on allegations contained only in the answer to support its motion. <u>Id.</u>

8

A.

A federal court with diversity jurisdiction must apply the choice-of-law rules of the forum state. <u>Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.</u>, 313 U.S. 487, 496 (1941), <u>superseded by statute on other grounds</u>. To determine North Carolina's choice-of-law rules for a claim of unfair and deceptive trade practices, "a federal court must look first and foremost to the law of the state's highest court." <u>Assicurazioni Generali, S.p.A. v. Neil</u>, 160 F.3d 997, 1002 (4th Cir. 1998). If North Carolina's Supreme Court has not spoken on the issue, the court may look to the North Carolina Court of Appeals for guidance. <u>Id.</u>

Bion argues that North Carolina's choice of law rules dictate that the law of New York or New Jersey, not North Carolina, applies to PLD's unfair and deceptive trade practices claim. (Mot. for J. on the Pleadings ¶ 4.) Because neither New York law nor New Jersey law recognizes such a claim by a commercial reseller like PLD, it is argued, PLD has failed to state a cognizable claim for unfair and deceptive trade practices. (<u>Id.</u> ¶¶ 5, 6.) In response, PLD argues that North Carolina's choice-of-law rules dictate that North Carolina law applies to the unfair and deceptive trade practices claim, (Pl.'s Br. in Opp'n at 17), but elects not to address, in the alternative, whether New York or New Jersey law would still permit it to assert the claim.

North Carolina's Supreme Court has not addressed the state's choice of law for an unfair and deceptive trade practices claim. And, while the North Carolina Court of Appeals has, two panels from the 1980's used different choice-of-law

9

tests. See Stetser v. TAP Pharmaceutical Prods., Inc., 598 S.E.2d 570, 580 (N.C. Ct. App. 2004) (recognizing a "split of authority").[3]  In Andrew Jackson Sales v. Bi-Lo Stores, Inc., 314 S.E.2d 797, 799 (N.C. Ct. App. 1984), the court distinguished tort actions for which lex loci is the appropriate choice-of-law rule from claims of unfair and deceptive trade practices to which the court "applied the law of the state having the most significant relationship to the occurrence giving rise to the action."  Two years later, the court in United Virginia Bank v. Air-Life Associates, Inc., 339 S.E.2d 90, 93-94 (N.C. Ct. App. 1986), recognized that "other cases have applied the 'most significant relationship' test to determine what State's law governs an action based on G.S. 75-1.1", but found the "better rule" is lex loci which applies "[t]he law of the State where the last act occurred giving rise to . . . injury".

In the following decade, a federal court sitting in North Carolina acknowledged that some courts had since applied the most significant relationship test to claims of unfair and deceptive trade practices, but that the North Carolina Supreme Court had "refused to adopt the most significant relationship test" in tort actions. United Dominion Indus., Inc. v. Overhead Door Corp., 762 F Supp. 126, 128 (W.D.N.C. 1991) (citing Boudreau v. Baughman, 368 S.E.2d 849, 854 (N.C. 1988)).  The court recognized that a claim for unfair and deceptive trade practices

_____

[3] Bion filed a copy of an Order in Cardiorentis AG v. IQVIA Ltd., 18CVS2313, 2018 WL 6918711 (N.C. Sup. Ct. Dec. 31, 2018), as a suggestion of subsequently decided authority on the application of North Carolina's choice-of-law rules for a claim of unfair and deceptive trade practices. [Docs. #144, 144-1.]

"is neither wholly tortious nor contractual in nature", but "given the trend toward use of the most significant relationship test in tort actions in general, the rejection of this test for general torts by the North Carolina Supreme Court supports a view that the North Carolina courts would also reject the test in [this] quasi-tort claim". Id. at 128 n.2; see also Associated Packaging, Inc. v. Jackson Paper Mfg. Co., No. 10CVS745, 2012 WL 707038, at *5 (N.C. Sup. Ct. (Mar. 1, 2012)) (unpublished) (citing United Dominion Indus., Inc. and stating the same). Of "particular importance" to the court was "the decision in United Virginia which rejected the most significant relationship test in favor of the traditional test." United Dominion Indus., Inc., 762 F. Supp. at 129. Other federal district courts in North Carolina have also applied the lex loci test to claims of unfair and deceptive trade practices. See M-Tek Kiosk, Inc. v. Clayton, No. 1:15CV886, 2016 WL 2997505, at *12 (M.D.N.C. May 23, 2016), appeal dismissed (July 19, 2016); Best v. Time Warner Inc., No. 1:11-CV-104-RLV-DSC, 2013 WL 66265, at *3 (W.D.N.C. Jan. 4, 2013); Martinez v. Nat'l Union Fire Ins. Co., 911 F. Supp. 2d 331, 338 (E.D.N.C. 2012); see also SmithKline Beecham Corp. v. Abbot Labs., No. 1:15CV360, 2017 WL 1051123, at *8 (M.D.N.C. Mar. 20, 2017) (applying lex loci test except where "the place of injury is so open to debate that application of the significant relationship test is more appropriate"). Cf. Edmondson v. Am. Motorcycle Ass'n, Inc., 7 F. App'x 136, 150 (4th Cir. 2001) (unpublished) ("We have held that when the place of injury is open to debate in regard to an unfair trade practices claim, North Carolina choice of law rules require a court to apply the law of the state with

the most significant relationship to the transaction.").  It is determined that the

North Carolina Supreme Court would apply the lex loci test to determine which

state's law applies to PLD's unfair and deceptive trade practices claim.

Furthermore, this is not a case in which the place of injury is unclear such that the

most significant relationship test should be employed.

The lex loci test dictates that the "law of the State where the last act

occurred giving rise to [PLD's] injury governs [its] Sec. 75-1.1 action." United Va.

Bank, 339 S.E.2d at 94.  The last act differs depending on the alleged tort. See,

e.g., Harco Nat'l Ins. Co. v. Grant Thornton LLP, 698 S.E.2d 719, 724 (N.C. Ct.

App. 2010) (finding that the lower court erred when it analyzed where the

negligent misrepresentation took place, rather than where the plaintiff suffered

injury); Associated Packaging, Inc., 2012 WL 707038, at *6 (explaining that the

last act for a negligence claim is the suffering of actual injury and for a negligent

misrepresentation claim is the detrimental reliance).  The last act giving rise to a

claim of unfair and deceptive trade practices is the suffering of damages.

SmithKline Beecham Corp., 2017 WL 1051123, at *8; see also Harco Nat'l Ins.

Co., 698 S.E.2d at 725 ("[A]t a minimum, it is necessary for a . . . court, applying

the lex loci test, to make some attempt to determine the state in which the injured

party actually suffered its harm.")  When a plaintiff suffers "commercial or financial

injury rather than physical injury, courts often look at the location where the

economic loss was felt." Clifford v. Am. Int'l Specialty Lines Ins. Co., No.

1:04CV486, 2005 WL 2313907, at *8 (M.D.N.C. Sept. 21, 2005) quoted in

SmithKline Beecham Corp., 2017 WL 1051123, at *8.  While a plaintiff may feel

the economic loss in the state of its principal place of business, North Carolina

courts have rejected a bright line rule requiring such a finding. United Dominion

Indus., Inc., 762 F. Supp. at 130 (declining to find a "bright line rule that in all

cases a[n] injury is sustained where corporate headquarters are located"); Harco

Nat'l Ins. Co., 698 S.E.2d at 725-26 (finding United Dominion Indus. persuasive

and rejecting a bright line rule because there are "a significant number of cases . . .

where a plaintiff has clearly suffered its pecuniary loss in a particular state,

irrespective of that plaintiff's residence or principal place of business").  Here, PLD

has failed to allege that it suffered damages – either when it felt the economic loss

of Bion's conduct or detrimentally relied on Bion's misrepresentations – in North

Carolina.

PLD argues that its unfair and deceptive trade practices claim "is based on

Bion's scheme to deprive PLD of Products that Bion was required to manufacture

and provide to PLD in North Carolina under the Supply Agreements", "[t]he express

terms of [which] tied the parties' relationship to North Carolina and North Carolina

law." (Pl.'s Br. in Opp'n at 19.)  To the extent PLD is suggesting that the

governing law provisions in the Agreements dictate that North Carolina law apply

to its unfair and deceptive trade practices claim, both the language of the

Agreements and the law belie that argument.  Each of the Agreements provides, in

relevant part, that "[t]his Agreement shall be governed and construed in all

respects by and under the laws of North Carolina, without regard to any choice of

13

law principles that would obtain a different result." (Ibuprofen Agreement § 14.3 (emphasis added); Naproxen Agreement § 17.6 (emphasis added); Cetirizine Agreement § 17.6 (emphasis added); Loperamide Agreement § 13.6 (emphasis added).) This provision may require application of North Carolina law to the interpretation and enforcement of the Agreement, but even by its own terms, such application is limited to the Agreement. "[I]t does not provide the applicable law for a claim based on unfair and deceptive acts." United Dominion Indus., Inc., 762 F. Supp. at 128 ("Because the liability under N.C. Gen. Stat. § 75-1.1 is not contractual, the choice of law provision included in the agreement . . . is not applicable."); see also ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 49 n.11 (4th Cir. 1983) ("We are satisfied that North Carolina courts would apply N.C. Gen. Stat. § 75-1.1 to the facts presented here without regard to the presence of the contractual choice of law provision. The nature of the liability allegedly to be imposed by the statute is ex delicto, not ex contractu.").

In addition, PLD argues that Bion's conduct occurred in North Carolina. (Pl.'s Br. in Opp'n at 20.) PLD contends that "Bion made misrepresentations to PLD in North Carolina", (id.), and it alleged that, on November 20, November 22, and December 4, 2017, Samtani told Cain – who was in North Carolina at the time – that there was a shortage of API. PLD looks to these three occasions on which Cain, present in North Carolina at the time, received emails and a telephone call from Samtani as support for its position that Bion's misrepresentations took place in North Carolina. Even so, as the Harco court explained, the focus is not where

14

the alleged misrepresentation took place.  Instead, the question is where PLD suffered harm from those misrepresentations.  There is no allegation that PLD, a Delaware limited liability company with its principal place of business in New York, detrimentally relied on or felt the economic impact of those misrepresentations in North Carolina.

PLD correctly notes that Bion too narrowly focuses on PLD's allegations of misrepresentations and omits allegations that Bion's other conduct was also unfair and deceptive. (Id.)  According to PLD, "[t]he bulk of PLD's claim is premised on Bion's actions." (Id.)  These actions include Bion's failure to submit PLD's orders to Patheon, instructing Patheon not to deliver Products to PLD, work with Patheon to develop codes and imprints for Bion's exclusive use, and causing Patheon to use API to manufacture Products for Bion instead of PLD. (Id. at 20-21.)  According to PLD, "[a]ll of these unfair and deceptive acts took place in North Carolina and support PLD's Chapter 75 claim." (Id. at 21.)

There is no disputing that Patheon, the High Point, North Carolina manufacturer of the Products, was an integral part of Bion's alleged unfair and deceptive acts.  However, Patheon is not a party to this action and is not alleged to have acted unlawfully.  Despite PLD's argument that it "affirmatively alleged that Bion's acts . . . occurred in North Carolina" and that "Patheon's re-directing its manufacturing operations for the Products – which occurred pursuant to Bion's mandate in North Carolina", (id. at 22), PLD is simply not alleged to have suffered damages in North Carolina, despite its argument otherwise, (see, e.g., id.).

PLD tries to recharacterize its injury from that which it alleged – loss of substantial sales and reputation – to "physical deprivation of Products in North Carolina", (id.). But, this case is not like United Virginia Bank, where the alleged injury was sustained in Virginia when a plane was sold below the promised price, or Lloyd v. Carnation Co., 301 S.E.2d 414 (N.C. Ct. App. 1983), where the alleged injury was sustained in Virginia when the plaintiff, an exclusive territorial distributor of bull semen, stopped his sales once another salesman sold bull semen in Virginia, or Harco, where the alleged injury was sustained in North Carolina when the plaintiff's funds held in a North Carolina trust fund were seized. While PLD did not receive all of the Products it ordered, the alleged resulting injury is loss of sales, which was not alleged to have been felt in North Carolina.

PLD argues that SmithKline Beecham Corp. supports the application of North Carolina law. There, the alleged injury to the plaintiff, GSK, was nationwide lost market share and profits from sales of Lexiva, an HIV drug, after the defendant, Abbot, increased the price to GSK of Abbot's booster drug, Norvir, 400 percent. 2017 WL 1051123, at *3, *8. GSK was a Pennsylvania corporation with its principal office in Pennsylvania, but with headquarters in North Carolina and Pennsylvania. Id. at *2. It alleged that "the center of economic impact was in North Carolina where the heart for 'research and development facilities and commercial operations in the HIV/AIDS area' was located". Id. at *9. While GSK "may have suffered injury in Pennsylvania", the court found North Carolina was "where it felt the damages associated with the loss in market share and lost profits

16

related to the HIV market and Lexiva" and, therefore, applied North Carolina law to the unfair and deceptive practices claim. Id. at *9. PLD argues that this "is precisely what happened here" because the "Agreements were formed in North Carolina", "Products were manufactured exclusively in North Carolina", "PLD inspected the manufacturing facilities in North Carolina", and "[t]he withholding of the Products in North Carolina damaged PLD." (Pl.'s Br. in Opp'n at 23-24.) Although PLD argues that "[u]nder the reasoning of GSK, North Carolina law must apply," (id. at 24), the facts of SmithKline Beecham Corp. and this case are easily distinguishable. PLD's only alleged presence in North Carolina is its general counsel's office in Winston-Salem, North Carolina and its visits to Patheon's manufacturing facility; whereas, GSK's research and development facilities and commercial operations for its HIV/AIDS business were in North Carolina. The reasoning of SmithKline Beecham Corp. does not require application of North Carolina law here.

PLD included among its reasons to apply SmithKline Beecham Corp. the assertion that "Products were delivered to PLD in North Carolina." (Id. at 23 (emphasis added); see also id. at 6, 13, 15 (all stating that Products were delivered to PLD in High Point).) The Amended Complaint merely alleged that the Products were shipped by Patheon from High Point, North Carolina directly to PLD. (See, e.g., Am. Compl. ¶ 50, 74, 96, 113.) PLD's argument must be based on the F.O.B. term in the Agreements. (See, e.g., Ibuprofen Agreement § 3.1 ("Banner's duties shall include . . . arranging for shipment of the Products, F.O.B. Banner's

manufacturing facility.").) The "general rule" is that "[w]here the contract of sale provides for a sale f.o.b. the point of shipment, the title is generally held to pass, in the absence of a contrary intention between the parties, at the time of the delivery of the goods for shipment at the point designated." Peed v. Burleson's Inc., 94 S.E.2d 351, 353 (N.C. 1956); see also N.C. Gen. Stat. § 25-2-319(1)(a). This passing of title to PLD when the Products were "delivered" at Patheon's facility, where they were also manufactured, to be shipped directly to PLD does not add sufficient weight to the facts to make them any more analogous to those in SmithKline Beecham Corp. or to support a finding that PLD suffered injury in North Carolina.[4]

Although there is no bright line rule that a company suffers its injury at its principal place of business, the allegations here lead to one conclusion. PLD suffered its injury – detrimentally relied on misrepresentations and felt the harm – in New York where it maintains its principal place of business. Accordingly, North Carolina's lex loci choice-of-law rule dictates that New York law apply to PLD's claim of unfair and deceptive trade practices.

---

[4] PLD alleged that Bion's conduct also injured North Carolina consumers and retailers, as well as Patheon's operations and workers at its High Point, North Carolina facility. (E.g., Am. Compl. ¶¶ 59, 60, 65.) But, the question is not whether anyone in North Carolina was harmed by Bion's conduct, but whether PLD suffered injury there.

B.

Bion argues that, although New York law applies here, New York's "statutory prohibition on unfair and deceptive trade practices" does not protect PLD because the statute "applies exclusively to conduct directed to consumers" and "PLD is not a consumer". (Defs.' Br. in Supp. at 18.)  PLD offers no response to Bion because it focuses solely on the application of North Carolina law.  Despite Bion's over-simplified argument, it is determined that PLD cannot bring its unfair and deceptive trade practices claim against Bion under New York law.

New York law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service", N.Y. Gen. Bus. Law § 349(a) (McKinney 2019), and "is directed at wrongs against the consuming public", Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 647 N.E.2d 741, 744 (N.Y. 1995) (describing the initial grant of enforcement authority to the Attorney General and the Governor's statement that the law was "an important new weapon in New York State's long standing efforts to protect people from consumer frauds").  "The statute was intended to empower consumers; to even the playing field in their disputes with better funded and superiorly situated fraudulent businesses." Teller v. Bill Hayes, Ltd., 630 N.Y.S.2d 769, 774 (N.Y. App. Div. 1995); see also id. at 773 (listing "typical transactions cognizable" under § 349 to include false advertising, pyramid schemes, deceptive pre-ticketing, misrepresenting of the origin, nature or quality of the product, false testimonial, deceptive collection against debtors, deceptive practices of insurance

companies, and bait and switch).  As evidence of the statute's consumer focus, some courts describe the disputed transaction as modest and note the limited statutory relief which caps treble damages for even willful or knowing conduct at $1,000. See, e.g., id. (citing N.Y. Gen. Bus. Law § 349(h)).

As applied to a claim of deceptive practices, consumers are "those who purchase goods and services for personal, family or household use". Sheth v. N.Y. Life Ins. Co., 709 N.Y.S.2d 74, 273 A.D.2d 72, 72 (N.Y. App. Div. 2000); see also Cruz v. NYNEX Info. Res., 703 N.Y.S.2d 103, 106 (N.Y. App. Div. 2000) ("In New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for 'personal, family or household purposes'.").

The elements of a § 349 claim for deceptive acts or practices are that the act or practice (1) was consumer-oriented, (2) materially misleading, and (3) resulted in injury to the plaintiff. Stutman v. Chem. Bank, 731 N.E.2 608, 611 (N.Y. 2000)).  An act is consumer-oriented when it has "a broader impact on consumers at large." Oswego Laborers' Local 214 Pension Fund, 647 N.E.2d at 744.  In other words, the conduct must "potentially affect similarly situated consumers." Id. at 745. See, e.g., Gaidon v. Guardian Life Ins. Co. of Am., 725 N.E.2d 598, 94 N.Y.2d 330, 344 (N.Y. 1999) (finding the defendant insurance company's extensive marketing scheme to be consumer-oriented); Karlin v. IVF Am., Inc., 712 N.E.2d 662, 93 N.Y.2d 282, 293 (N.Y. 1999) (finding the defendant's multi-media dissemination of information to the public to be consumer-

oriented); Wilner v. Allstate Ins. Co., 893 N.Y.S.2d 208, 71 A.D.3d 155, 164

(N.Y. App. Div. 2010) (finding the defendant insurance company's conduct was

consumer-oriented because the homeowners' insurance provision at issue was not

unique to the plaintiffs, but instead was in every policy and, therefore, required any

consumer insured by the policy to act according to its terms). Section 349 "was

not intended to supplant an action to recover damages for breach of contract

between parties to an arm's length contract." Teller, 630 N.Y.S.2d at 774.

"A plaintiff need not be a consumer to bring a claim under § 349 . . . , but

the challenged conduct must affect consumers." Axion Inv. Advisors, LLC v.

Deutsche Bank AG, 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017). In Oswego

Laborers' Local 214 Pension Fund, the plaintiffs were not-for-profit associations

that administered pension benefits and health insurance of union members and

their beneficiaries and sought to open interest-bearing savings accounts with

defendant bank. Id. at 743. However, years after the accounts were opened, the

plaintiffs learned that the bank had not been paying interest on certain principal

amounts, because the bank had opened the accounts as though they were for for-

profit commercial entities whose principal upon which interest could be paid was

capped. Id. at 743-44. The court found that the bank's conduct was consumer-

oriented because it "dealt with plaintiffs' representative as any customer entering

the bank to open a savings account, furnishing the Funds with standard documents

presented to customers upon the opening of accounts." Id. at 745. Further, "[t]he

account openings were not unique to these two parties, nor were they private in

nature of a 'single shot transaction'". Id. The bank's actions could have "potentially affect[ed] similarly situated consumers." Id.

Similarly, in North State Autobahn, Inc. v. Progressive Insurance Group Co., 953 N.Y.S.2d 96, 99 (N.Y. App. Div. 2012), the plaintiffs operated a vehicle repair shop and sued the defendant insurance companies which underwrote automobile insurance policies in the state of New York. The defendants established and advertised a direct repair program ("DRP") through which they contracted with vehicle repair shops for rates and repair terms, but the plaintiffs were not members of the DRP. Id. The defendants allegedly misled claimants to believe they had to have their vehicles repaired at DRP shops and misrepresented the workmanship, price, timeliness, and character of non-DRP shops. Id. They also allegedly issued repair appraisals well below market value and the plaintiffs' estimates and told claimants that the plaintiffs would make only partial payments for repairs which would lead to out-of-pocket costs. Id. Despite the defendants' argument that this was a private contract dispute, the court found that the defendants' conduct was consumer-oriented because it misled the plaintiffs' customers, "was part of an institutionalized program", was a "standard practice", and "was routinely applied to all claimants who sought to have their vehicles repaired by the plaintiffs or by any other independent repair shop." Id. at 102. This conduct had a "broad[] impact on consumers at large". Id. (alteration in original).

As is apparent, "consumer orientation does not preclude its application to disputes between businesses per se". Cruz, 703 N.Y.S.2d at 107. However, "it

does severely limit it." Id. "Where the gravamen of the complaint is harm to a business as opposed to the public at large, the business does not have a cognizable cause of action under § 349." Vitolo v. Mentor H/S Inc., 426 F. Supp. 2d 28, 34 (E.D.N.Y. 2006) (quoting Gucci Am., Inc. v. Duty Free, Ltd., 277 F. Supp. 2d 269, 274 (S.D.N.Y. 2003), and dismissing the § 349 claim because the "[c]omplaint focuse[d] almost entirely on the losses suffered by Plaintiff and his business, rather than to consumers or Plaintiff's patients"). "Section 349 . . . was not intended to apply to arms-length business transactions between sophisticated parties, but rather, ought to redress wrongs committed against consumers in general." Id. at 37. "[C]learly not cognizable under the statute[] are large, private, single-shot contractual transactions." Teller, 630 N.Y.S.2d at 773. See also In re Rezulin Prods. Liability Litig., 390 F. Supp. 2d 319, 337-38 (S.D.N.Y. 2005) (finding the transaction not to be consumer-oriented where it was not intended for the ultimate consumers, but instead involved two large, sophisticated parties and "sizeable economic consequences"); N.Y. Univ. v. Continental Ins. Co., 662 N.E.2d 763, 87 N.Y.2d 308, 321 (N.Y. 1995) (finding the transaction was "essentially a 'private' contract dispute over policy coverage and the processing of a claim" that did not "affect[] the public at large" because the parties were large and knowledgeable, the insurance policy was complex and tailored to meet the university's needs, the premiums exceeded $55,000, and loss was covered up to $10 million); Oswego Laborers' Local 214 Pension Fund, 647 N.E.2d at 744

(explaining that "[p]rivate contract disputes, unique to the parties, . . . would not fall within the ambit of the statute").

For example, in Pfizer, Inc. v. Stryker Corp., 256 F. Supp. 2d 224, 225 (S.D.N.Y. 2003), the plaintiff sold and the defendant purchased the assets and stock of a subsidiary of the plaintiff which manufactured artificial replacement knee joints. The defendant alleged in its counterclaims that the plaintiff "made fraudulent misrepresentations of then existing facts" and agreed to perform when it never intended to do so, in violation of § 349. Pfizer, Inc. v. Stryker Corp., No. 02Civ.8613LAK, 2003 WL 21660339, at *1, 4 (S.D.N.Y. 2003). However, the court found that

> [a]lthough consumers eventually stood to be affected by any defects in the product at issue, the questions whether Pfizer told Stryker the truth when it represented that the business was in compliance with law and whether it intended to comply with its notice and related obligations are essentially private matters. This was a custom-crafted, $2 billion transaction between two large, sophisticated parties. It does not come within Section 349.

Id. at *4.

Here, the disputed conduct is more akin to that in Pfizer, Inc. than any of the cases involving consumer-oriented conduct. First, the gravamen of the Amended Complaint is harm to PLD, not to the public at large. Although PLD alleged harm to consumers, those allegations are sprinkled throughout the complaint alongside allegations of injury to retailers and Patheon's operations, (Am. Compl. ¶¶ 59, 60, 88, 89, 107, 108, 124, 125, 149), and are secondary to the allegations of harm to PLD. For example, while Bion's conduct allegedly "injured the consumers of

generic Ibuprofen softgels in North Carolina by limiting business productivity and product availability" and causing consumers "who preferred the softgel dosage . . . to pay a higher price to purchase the brand product", (id. ¶ 65), the same conduct allegedly caused PLD "to lose substantial sales", (id. ¶¶ 65, 68), lose "goodwill", (id. ¶ 69), and suffer "damages and irreparable harm", (id. ¶ 70). The allegations of harm resulting from Bion's conduct with respect to generic Naproxen, Cetirizine, and Loperamide are similar to those above. (See id. ¶¶ 90, 104, 121, 150 (harm to consumers), ¶¶ 86, 90, 92, 106, 123, 126, 148, 154, 155 (harm to PLD)). This harm to PLD is repeated often and highlighted in the Complaint. For example, at the conclusion of the factual allegations related to each of the Agreements, PLD alleges that Bion "has caused damages and irreparable harm to PLD." (Id. ¶¶ 70, 92, 109, 126.) The essence of PLD's complaint is that Bion's alleged anti-competitive conduct was designed to place Bion in the best position possible to compete with PLD once the Agreements expired and, in the meantime, PLD suffered substantial lost sales, reputational damages, and irreparable harm "in excess of $5 million." (Id. ¶ 157.)

Next, this dispute is not between parties with disparate bargaining power. Bion and PLD are sophisticated businesses involved in the manufacture and sale of generic pharmaceuticals to well-known national retailers, all under the watchful eye of the Food and Drug Administration which granted Bion manufacturing approval, (e.g., id. ¶ 28). PLD essentially served as an intermediary between Bion's allegedly

tortious conduct and consumers, providing protection for consumers unsuspecting of Bion's ulterior motives.

Furthermore, these parties and their predecessors have contracted with each other since 2003 for the manufacture and sale of millions of capsules of these Products, (e.g., id. ¶¶ 66, 91, 122), and these contracts and their amendments are tailored to the parties' capabilities and needs.

In sum, Bion's alleged conduct does not have "a broader impact on consumers at large" and, is, thus, not consumer-oriented. Instead, this is essentially a private dispute between sophisticated parties that is not covered by the prohibitions of § 349.

IV.

For the reasons stated in this Memorandum Opinion, IT IS HEREBY ORDERED that Defendants' Motion for Judgment on the Pleadings as to Plaintiff's Claim for Unfair and Deceptive Trade Practices (Seventh Cause of Action) [Doc. #136] is GRANTED and that Plaintiff's Seventh Cause of Action is DISMISSED. IT IS FURTHER ORDERED that Defendants' Motion for Judgment on the Pleadings as to Plaintiff's Claim for Unfair and Deceptive Trade Practices (Sixth Cause of Action) [Doc. #123] which sought to dismiss a claim asserted in a complaint that has since been amended is DENIED AS MOOT.

This the 14th day of February, 2019.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge